# CHARLESTON.

### J. W. SIMPSON v. GRAND INTERNATIONAL BROTHERHOOD OF LOCOMOTIVE ENGINEERS (two cases).

AND

### G. A. SMITH v. GRAND INTERNATIONAL BROTHERHOOD OF LOCOMOTIVE ENGINEERS (two cases).

Submitted January 29, 1919.   Decided February 11, 1919.

1. ASSOCIATIONS—*Suits Against Associations by Name—Jurisdiction— Suit Against Members.*

    In the absence of a statute authorizing such procedure, an unincorporated society or association cannot be sued as an entity by its name, nor can a judgment be rendered against it merely by name. To confer jurisdiction, the persons composing it, or some of them, must be named as parties and process served upon them individually. (p. 359).

2. COURTS—*Submission to Jurisdiction—Amendment of Pleadings and Process—Judgment.*

    If such a society or association, being sued as a corporation, files a plea denying its corporate existence, and such plea is ascertained to be well founded, its failure to object to an amendment of the process and pleadings, so as to treat it as a fraternal benefit society, under a statute permitting actions against certain classes of such societies by name, does not amount to a submission to the jurisdiction of the court, to such an extent or in such manner as will sustain a judgment against it, unless the proof shows it to be such a society as may be so sued by virtue of the statute. (p. 349).

3. CORPORATIONS—*Assumed Name—Suit—Proof of Incorporation.*

    Though a corporation contracting under an assumed name may be sued by such name and is estopped to deny its existence for the purposes of the litigation, proof of incorporation of the individuals so contracting is essential to the maintenance of the action. (p. 359).

4. SAME—*Denial of Corporate Existence—Estoppel.*

    The doctrine of estoppel is not available to persons dealing or contracting with an unincorporated association, with knowledge of its character, in an effort to prevent it from denying corporate existence on its part. (p. 359).

5. INSURANCE—*"Fraternal Benefit Society"—Statute.*

    An unincorporated association paying no death benefits nor any disability benefits in excess of $500.00 in one year to any one

person, is not a fraternal benefit society within the meaning of chapter 55A of the Code.   (p. 361).

6. SAME—*Suit Against Association as Corporation—Jurisdiction—Statute.*

'  Nor is such an association identical with an incorporated life and accident insurance association or an incorporated building association or an unincorporated pension association, composed of members of the general association to which they are related, in such sense as to make it amenable to judicial process as a corporation, or to bring it within the statute authorizing judicial procedure against fraternal benefit societies, by name.   (p. 361).

7. ASSOCIATION—*Judgment—Action Ex Delicto—Jurisdiction—Judgment Against Members.*

An action *ex delicto* against such an association and individual members of one of its subordinate lodges or divisions predicated upon alleged wrongful and illegal expulsion from such subordinate organization, may be prosecuted to judgment, against the individual defendants, on failure of jurisdiction of the association itself, the parties being liable jointly and severally, if liable at all.   (p. 363).

8. SAME—*Wrongful Expulsion of Member—Liability—Grounds.*

An inquiry as to the liability of an unincorporated association and members thereof, for alleged wrongful and illegal expulsion, participated in by a subordinate body acting under the orders of a superior officer constituting the official head of the association, involves consideration of the rights, duties, powers and obligations of the members, the subordinate bodies and superior officers and tribunals, as determined by the constating articles of agreement, by-laws, rules and regulations, often designated as the constitution, statutes, and rules, and the usages and precedents of such organizations.   (p. 363).

9. SAME—*Constitution and Rules—Construction—Conclusiveness.*

Like other written instruments, such laws, rules and regulations are proper subjects of interpretation, and the reasonable construction given them by the officers and tribunals expressly or impliedly charged with the duty of interpretation, or of which they are reasonably and fairly susceptible, is binding upon the members and subordinate organizations of the order, and also upon the courts in the administration of justice in causes involving the rights of members, if it does not contravene public policy or any public law.   (p. 363).

10. SAME—*Expulsion of Member—Action of Superior Officer—Conclusiveness.*

Right of an officer of an unincorporated association, designated

in its constitution, as its official head and authorized by that instrument to exercise full control over the order in general and to sign all charters and decide all controversies appealed to him, subject to a power of review by a triennial convention of the order, whose enactments and decisions upon all questions are declared to be the supreme law of the association, and to whom such officer reports his transactions, to exercise appellate power in a case in which a member tried on a charge of infraction of a rule, justifying his expulsion, if guilty, has been acquitted, in the absence of an appeal and of his own volition, falls within a reasonable and fair construction of the laws and rules conferring his authority, wherefore a court cannot consistently deny its existence, in the trial of an action for damages for illegal expulsion, in the absence of a denial thereof by the association's tribunal of last resort. (p. 371).

11.  SAME—*Appellate Power of Superior Officer—Suspension of Member.*

Nor can it be judicially determined by a civil court, that such an officer having additional power and authority to suspend the charter of the subordinate organization in which such trial has occurred, may not exercise his appellate power in such manner and his power of suspension conjointly and simultaneously, so as to compel expulsion or loss of the charter, the evidence adduced on the trial affording bases for two honest and reasonable opinions as to whether it preponderates decidedly against the innocence of the accused member.   (p. 371).

12.  SAME—*Second Trial of Member—Presumption—Constitution of Association.*

The legal presumption, if any, against right in the tribunals of an unincorporated association, to subject a member thereof to a second trial for the same offense, is overthrown and excluded by the terms of the constitution of such an association, making the enactments and decisions of its highest tribunal its supreme law. (p. 375).

13.  SAME—*Expulsion of Member—Damages—Malice.*

An inference of malice on the part of members of a subordinate association, in voting for an expulsion of a member, after having voted for his acquittal of the charges preferred against him, sufficient to sustain a verdict predicated on such theory, is not deducible from their mere change of attitude, especially when a superior officer claiming authority to do so, not negatived by any express provision of the laws and regulations of the order, nor by any decision of the association's tribunal of last resort, has intervened and annulled the first decision on the ground that the acquittal was plainly contrary to the weight of the evidence. (p. 375).

14.  SAME—*Expulsion of Member—Action of Superior Officer—Malice.*
     Nor does the presence, on the occasion of the expulsion, of a
     member between whom and the accused there has been previous
     animosity or ill feeling, and who advised and encouraged a su-
     perior officer to demand rescission of what was deemed an unjus-
     tifiable acquittal and, on the occasion of the expulsion, gave his
     reason for doing so, but was excused from voting, on his own mo-
     tion, raise an inference of malice sufficiently strong to sustain a
     finding thereof.    (p. 375).

Error to Circuit Court, Mercer County.

Suits by J. W. Simpson and G. A. Smith against the Grand
International Brotherhood of Locomotive Engineers and
others.    Verdict for plaintiffs against the Grand Interna-
tional Brotherhood of Locomotive Engineers, and in favor
of the other defendants, and recovery in the Smith case re-
duced on motion for new trial and in the Simpson case mo-
tion for new trial overruled, and defendant Brotherhood
in each case brings error.

*Affirmed in part.  Reversed in part.  Remanded.*

*Sanders, Crockett & Kee* and *William H. Werth,* for
plaintiffs.

*J. M. McGrath* and *French & Easley,* for defendants.

POFFENBARGER, JUDGE:

In each of these two cases involving the same general prin-
ciples and procedure and giving rise to similar questions, two
writs of error were obtained.    In each, a number of individ-
uals were joined with the unincorporated association known
as the Grand International Brotherhood of Locomotive En-
gineers, as defendants.    Under instructions from the court,
the jury in each returned a verdict for all the individual
defendants, and a verdict against the association, assessing
the damages in the Smith case at $15,931.00, and in the Simp-
son case, at $11,000.00.    In each, the jury in response to in-
terrogatories propounded by the court itemized its assessment
of the damages, allowing Smith $1,531.00, as compensation
for the loss of his insurance, $2,400.00 for other compensa-
tory damages and $12,000.00 as punitive damages; and Simp-
son, $4,500.00 as compensation for the loss of insurance and

$6,500.00 as additional compensatory damages. On a motion for a new trial, the court eliminated the punitive damages in the Smith case and rendered judgment for the residue of the verdict, amounting to $3,931.00. In the other, the motion for a new trial was overruled and judgment rendered for the entire amount of the verdict. Writs of error were awarded to both plaintiffs, on their complaints of the action of the court in directing a verdict for the individual defendants, as well as other assignments of error set forth in their petitions; and, on numerous assignments of error, like writs were awarded to the Brotherhood.

Both actions seek damages for wrongful expulsion of the plaintiffs from the N. H. Smith Division No. 448 of the Brotherhood, on account of alleged violations of rules and regulations of the association, under coercion by Warren S. Stone, Grand Chief Engineer of the Brotherhood, the division having previously exonerated them on two occasions, once by a mere resolution and again by a formal vote in accordance with the association laws and regulations. Stone being a non-resident and not served with process, was eliminated from the case by a dismissal. The other thirty-three individual defendants in each case, residents of the state, were made parties under the impression that they were liable in damages to the plaintiffs, by reason of their having voted for their expulsion from the division. As to fourteen of them, Smith's action was dismissed on his own motion, leaving nineteen. The other action was prosecuted to final judgment as to all of the individuals defendants. On the assumption of their identity with the Brotherhood, the Locomotive Engineers Mutual Life and Accident Insurance Association and the Locomotive Engineers Building Association, both foreign corporations, were also joined as defendants, but the actions were dismissed as to the former on its demurrers to the declarations, and as to the latter on its special pleas denying the jurisdiction of the court as to it.

A preliminary inquiry of vital importance in some aspects of the case is whether the Grand International Brotherhood of Locomotive Engineers has been brought within the jurisdiction of the court by sufficient process and pleadings.

Upon the assumption that it was a corporation qualified under the laws of the state to do business here, the summons in each case, as to it, was served upon the Auditor of the state, and it was impleaded as a corporation. It filed special pleas at rules denying that it was a corporation, to which the plaintiffs replied generally and the issues thus raised were determined in favor of the defendant, and the actions accordingly dismissed as to it. But in the same order in which the dismissal was formally adjudged, the plaintiffs were permitted to amend both the summons and the declaration in each case, by striking out the words "a corporation," and inserting in lieu thereof the words "a fraternal beneficiary association." Assignments of error claim the benefit of the technical dismissals entered upon the record; but, going beyond that, objections to the amendments are based upon other grounds. Deeming itself to be out of court, by reason of the dismissals, at the time of the making of the amendments, the association entered no objection, but the individual defendants objected and excepted to the action of the court in permitting the amendments. The course pursued by the plaintiffs was adopted upon two theories; (1), identity of the Grand International Brotherhood of Locomotive Engineers with the Locomotive Engineers Mutual Life and Accident Insurance 'Association and the Locomotive Engineers Building Association; and, (2), liability of the association to be sued by its association name under the provisions of chapter 55A of Barnes' Code, 1918.

Of course a corporation, like an individual, may do business under an assumed or false name and be sued by such name, *Marmet Co.* v. *Archibald,* 37 W. Va. 778; but, in order to apply this doctrine, incorporation by some name must be established. One who contracts with and receives money from certain persons acting as a corporation under a valid charter granted under a general law, but acts within both the charter and the general law, cannot avoid the obligation of the contract by denial of the corporate existence of the persons so contracted with. *Bon Aqua Imp't. Co.* v. *Standard Fire Ins. Co.,* 34 W. Va. 764. But this involves action in a corporate capacity or name. In the absence of evidence

to the contrary, there is a presumption that persons representing themselves to be incorporated and contracting in a corporate name, are what they represent themselves to be, and the situation. of the parties and circumstances are often such as to estop them from denial of the fact. *Singer Mfg. Co.* v. *Bennett,* 28 W. Va. 16; *Miller* v. *Newburg Orrel Coal Co.,* 31 W. Va. 836. Lack of proof of the element of representation of corporate existence renders this principle unavailable to the plaintiffs. And, in the absence of proof to the contrary, very slight evidence of incorporation will sustain a finding that a party to a contract is a corporation, though not so described in the contract. *Brotherhood of Locomotive Firemen* v. *Cramer,* 60 Ill. App., 212. *Independent Order of Mutual Aid* v. *Paine,* 122 Ill. 625. Under some of these decisions, the adoption of a name by which the organization shall be known and the use of a seal, as disclosed by correspondence found in the record, might be sufficient evidence to establish the corporate existence of the association, contrary to the finding in the trial court, in the absence of proof to the contrary, but direct and positive evidence that it is a voluntary and unincorporated association clearly overthrows a mere inference arising from these circumstances. There is no proof that the contracts of membership made between the plaintiffs and the association were understood or deemed by them to have been made in a corporate name. On the contrary, both admit in their testimony, that the association is not incorporated. Not having been mislead nor deceived as to the capacity in which the association made its contracts with them, they are not in a position to invoke the doctrine of estoppel.

The amendments were permitted and the association held to answer, under the impression that the Brotherhood is a fraternal benefit society, within the meaning of the provisions of ch. 55A of the Code, represented by the State Auditor, for purposes of service of process, and liable to be sued in its association name. It filed special pleas denying that it is such a society as is contemplated by that chapter and averring itself to be within an exception provided by section 29 thereof. That section declares nothing contained

in the act shall be construed to affect or apply to grand or subordinate lodges of Masons, Odd Fellows, Knights of Pythias, the Junior Order of United American Mechanics, nor to similar societies that do not issue insurance ceritficates. This exemption applies to societies paying death benefits, if such benefits do not amount to more than $300.00 to any one person, and to those paying disability benefits, not exceeding $500.00 to one person in one year. The Brotherhood proper pays no death benefits, nor anything in the nature of a disability benefit, except an allowance out of what is known as the Indigent Fund, which, under no circumstances, can exceed $30.00 per month to one person. Within the order, there is a pension association, but its benefits go only to those who contribute to its maintenance. It is self-sustaining and cannot in any event create a liability upon the Brotherhood. The Pension Association might come within the statute, but the Brotherhood is a separate and distinct, though an allied or connected organization. Section 1 of the chapter defining the fraternal benefit society includes provision for the payment of benefits, in accordance with the provisions of sec. 5. Other elements of the society required by sec. 1 are defined by secs. 2 and 3, and the whole chapter, as originally passed, contemplated organizations providing benefits in the nature of indemnities, for their members. Some additions subsequently made confer certain privileges on fraternal organizations which they did not formerly enjoy, but nothing in the later acts altered the purpose or effect of the original statute. The Brotherhood is not within the statutory definition of a fraternal benefit society, because it pays no benefits, ordinarily, and never in such an amount as to deprive it of the exemption allowed by sec. 29 of chapter 55A of the Code.

The Grand International Brotherhood of Locomotive Engineers and the Locomotive Engineers Mutual Life and Accident Association, the two corporations to which reference has been made, are not identical. The Grand International Brotherhood covers vastly more ground than the insurance association. Its purpose is the promotion of the general interests of railway locomotive engineers. The insurance as-

sociation merely provides life and accident indemnities for
such members of the Brotherhood as become certificate or
policy holders therein ,and the building association is a
corporation owning and managing a Brotherhood building
in the City of Cleveland, Ohio. Though all members of the
Brotherhood having the necessary physical qualifications are
expected or required to become members of the insurance
association, and membership in the Brotherhood is a condi-
tion both precedent and subsequent to right of membership
in the insurance association, all members of the Brotherhood
are not members of that association. The estimated number
of those who are not members of the latter, because they are
physically disqualified from such membership, is estimated
at about four thousand. The insurance association limits
the scope of its insurance business, as any other insurance
corporation might, to members of the Brotherhood in good
standing, and makes its collections of assessments for pay-
ment of indemnities through the officers of the local division
of the Brotherhood. Nevertheless, the insurance association
is a distinct entity from the Brotherhood. It is a corpora-
tion capable of contracting, suing and being sued and owning
and holding property as fully and completely as an individ-
ual may own and hold it, and the association known as the
Brotherhood has no such capacity and is not in any legal
sense the owner of the assets of the insurance association, nor
liable on its contracts of insurance. That an unincorporated
society and an incorporated insurance association, composed
of members of the former, and affiliated with it, are not iden-
tical has been expressly decided in *Hajek* v. *Bohemian-Slav-
onian Benevolent Society,* 66 Mo. App., 568. Relationship
of the institutions is not determinative of the question of iden-
tity. Almost anything conceivable bears some sort of rela-
tion to everything else. The common features of animals
do not make them identical. Nor does the close relation of
parent and off-spring in the same species. Obviously, these
organizations are not actually nor legally identical. Nor does
the relation subsisting between them make the Brotherhood
a fraternal benefit society within the meaning of the statute.
The legislative intent in this respect is rendered clear by

the express provision exempting the Junior Order of United American Mechanics, except the insurance branch of the order.

Whether or not the filing of the special pleas denying incorporation, or failure to object to the amendments until a term subsequent to the one at which they were made, might constitute a legal submission to the jurisdiction of the court, under circumstances different from those obtaining here, is an academic inquiry to which no time or labor need be devoted. An essential element of submission to jurisdiction is the existence of some person capable of performing the act. The law courts take no cognizance of unincorporated associations, organizations or societies, in the absence of a statute authorizing them to do so. A partnership cannot be sued by the firm name. The law courts do not recognize it as an entity, wherefore it is necessary, in order to obtain jurisdiction of it, to make the individuals composing the firm parties and serve process upon them. *Courson* v. *Parker,* 39 W. Va. 521; *Brown* v. *Gorsuch & Sons,* 50 W. Va. 514. If an association is not incorporated and there is no statute authorizing procedure against it by its name, the action must be brought against the individuals composing it. 29 Cyc. 218; Bacon, Life & Accident Ins., Sec. 612. It can neither waive errors nor enter an appearance as an entity. If the theory of a technical submission can be sustained, it would avail nothing, for there can be no judgment against a voluntary unincorporated society by name. The judgment must in all cases be against the individuals composing it, or some of them, unless a statute provides otherwise. *O'Connel* v. *Lamb,* 63 Ill. App. 652; *Hajek* v. *Bohemian-Slavonian Benevolent Society,* 66 Mo. App. 568; *Lumber Co.* v. *Oliver,* 65 Mo. App. 435; *Moore* v. *Stemons,* 119 Mo. App. 162; *Crawley* v. *American Society of Equity,* 153 Wis. 13; Bacon's Life & Accident Ins., sec. 612.

Lack of jurisdiction of the Grand International Brotherhood of Locomotive Engineers makes reversal of the judgment against it inevitable and also renders it unnecessary, as well as improper, to pass upon any of the numerous rulings made in the course of the trials, in so far as they might,

if it were a party to the cases, affect its interests. Without having brought the association within its jurisdiction, the trial court could not properly decide anything against it, nor can this court do·so. But, since the court acquired jurisdiction of the individual defendants, it is necessary to determine whether it properly directed verdicts in their favor.

With a single exception, they are all members of the N. H. Smith Division No. 448. One of them is a member of another division. Through their respective divisions, they are no doubt members of the grand international organization. Membership in the general organization seems to be attainable only by means of membership in the local divisions. If, by virtue of its jurisdiction over them, the court had jurisdiction *pro tanto* of the Brotherhood, the measure of relief to which the plaintiffs are entitled, if any, is a judgment against them in their individual capacities. *Crawley* v. *American Society of Equity,* 153 Wis. 13. This is true not only because the individual defendants, if jointly liable with others and not otherwise, did not plead the non-joinder of other necessary parties; but also because the actions are for damages for wrongs, not breaches of contract, and the plaintiffs have their election to sue all of the wrongdoers or only one or more of them. *Cunningham* v. *Sayre,* 21 W. Va. 440; *Riverside Cotton Mills* v. *Lanier,* 102 Va. 148.

Although the plaintiffs claim to have been injured by wrongful and illegal acts of the defendants, the injuries of which they complain were deprivation of contractual rights. Both their right of membership in the division and in the Brotherhood and the powers, privileges and rights of the defendants within the same organizations are measured and defined by the organic or fundamental laws thereof, called the constitution and statutes, and its rules and regulations. For convenience, these documents constituting the agreement, are called the laws of the organization, and breaches and violations thereof are termed offenses. Likewise, the tribunals of the organization, charged with the duty of determining whether or not the contract has been violated, are regarded as judicial or quasi-judicial bodies. This contract governs not only the rights of individual members and local

divisions but the higher tribunals and their officers as well. The inquiry as to liability, therefore, involves consideration of the relations of all the parties to the action, plaintiffs and defendants, the division to which they belonged, the Grand Chief Engineer and what is known as the Grand International Division.

Both declarations are framed upon the theory of lack of right, power and authority in the Grand Chief Engineer to make certain rulings in obedience to which the division expelled the plaintiffs; lack of right in the division to adopt the procedure ordered by the Grand Chief Engineer, resulting in their expulsion; malicious and wrongful action on the part of individual members of the division, in voting for expulsion on the trial which resulted in such action; and wrongful, malicious and concerted action on the part of such members and the Grand Chief Engineer, amounting in legal effect to a conspiracy for the accomplishment of illegal and injurious expulsion of the plaintiffs.

The alleged misconduct of the plaintiffs for which they were expelled related to an alteration or disturbance of working conditions or service on a certain portion of the line of the Norfolk & Western Railway, within the jurisdiction of the General Adjustment Committee, to which the members of the N. H. Smith Division No. 448 were subject. At that point, the equipment of the railroad company was pooled so as to afford the engineers and firemen an equitable and just apportionment of employment. The motive power consisted of steam locomotives and electric motors. Under the pooling arrangement, all of the engineers handled indiscriminately both classes of motors, taking their turns regularly in the service. This arrangement was changed by the Road Foreman of Engines and the electric motors given permanently to certain men, two of them to Smith and Simpson. This action resulted in serious disturbance of some of the other employees. It necessitated a general rearrangement, occasioning loss of employment or wages to some of them. Twelve members of the N. H. Smith Division No. 448 preferred written charges against the plaintiffs, accusing them of having procured this alteration, ''The cutting of the Elk Horn

Pool,'' in violation of sections 20 and 35 of the Standing
Rules of the organization and Article 11(a) of what is known
as the Chicago Joint Working Agreement.   These charges
were referred to an investigating committee composed of
three members, who sustained them and gave the accused
members notice to appear at a division meeting to be held
May 21, 1916, for trial.   At that meeting, Smith and Simp-
son appeared and denied the truth of the charges.   The
chairman of the investigating committee stated that J. S.
Mastin, the Road Foreman of Engines, by whom the altera-
tion of crews was made, had told him the Elk Horn crews
would not have been cut off, had not Smith and Simpson come
to his office.   Thereupon, the accused presented a statement
in writing from Mastin, saying they were not responsible
for the action complained of, and that the trouble was in his
office and would have been corrected, when he came in, if
no one had said anything about it.   On this statement, the
Division passed a resolution exonerating both of the men.
A brief but comprehensive and dispassionate report of the
action of the divsion was immediately made by the secretary,
to S. H. Huff, Chairman of the General Adjustment Com-
mittee of the Brotherhood of Locomotive Engineers, on the
Norfolk & Western Railway, who transmitted it to the Grand
Chief Engineer.   This official, on June 9, 1916, wrote a let-
ter to the secretary of the division requesting a copy of the
charges, the evidence and the notice to appear for trial.   Huff
no doubt was responsible in some degree for the preferment
of the charges and this action on the part of the Grand Chief
Engineer.   He had been called to Bluefield, by a telegram, in
connection with the Elk Horn trouble, before the charges
were preferred, and he later had interviews with Stone, the
Grand Chief Engineer, at New York and Washington, con-
cerning the Smith and Simpson cases, before they were finally
disposed of.   After having received these papers, Stone dis-
approved the method of procedure adopted by the divsion,
as well as the result.   In such cases, the statutes of the or-
ganization require the decision to be made by ballot.   He,
therefore, ordered the cases to be reopened and disposed of in
accordance with the laws of the organization.   In obedience

to this direction, the accused parties were notified to appear
again for trial on the same charges, on July 16, 1916.  On the
occasion of this second trial, Mastin was present and the rec-
ord of the proceedings represents him as having admitted
that Simpson and Smith caused the cutting of the crews.
Marra, chairman of the investigation committee, is repre-
sented as having made a contradictory statement assented to
by Mastin.  The record further states that Mastin, in re-
sponse to a question by Simpson denied that the accused
had requested the cutting of the crews, and said that they
had come to his office at the request of the Assistant Road
Foreman, E. M. Bill.  The evidence having been thus ad-
duced, ballots were taken which resulted in acquittals, eight
black balls and fifteen white ones having been cast in Simp-
son's case, and twelve black ones and twenty white ones in
Smith's.  In his report of this trial, to the Grand Chief En-
gineer, dated July 21, 1916, Wade Miller, Chief Engineer
of Division No. 448, did not stop with the statement of the
result, but commented rather extensively upon the procedure
and the merits of the controversy.  He said Mastin had not
denied having admitted to the committees, that Smith and
Simpson had caused the cutting of the crews, but had en-
deavored, in his oral statement to the division, to cover it
up and leave the impression that the disturbance of the crews
was due to a mistake in his office, made by Bill, the Assistant
Road Foreman.  He also said Ballengee, a member of the
division, had overpersuaded and mislead the members in
their voting, by a speech he had delivered on the occasion.
He concluded by saying the officers of the division had done
all in their power to make the laws of the organization ef-
fective in the cases, but had found it impossible to do so.  In
his reply, dated, July 24, 1916, the Grand Chief Engineer
expressed confidence in the integrity of the officers of Divi-
sion No. 448, and then proceeded as follows: "It is also
very evident that Bro. Mastin (regardless of the fact that
he is an officer of the company) not only uses his official po-
sition to play favorites, but with a few of his followers dom-
inates the division, and defeats the carrying out of the plain
language of the law.  In our opinion, the time has arrived

when, if over 200 loyal members will stand by and allow this condition to exist, Division 448 should cease to exist. We will place the entire matter before the Advisory Board of Grand Officers at our first opportunity and if they concur in our opinion the charter of 448 will be suspended, pending action of the next convention.'' On August 6, 1916, a resolution to rescind the action of July 16, was offered and consideration thereof was postponed until the next meeting, held, August 13, 1916, and, at that meeting, it was unanimously adopted. On August 14, 1916, the investigating committee again signed a report sustaining the charges originally made on April 22, 1916, and notified the accused to appear for trial at a meeting to be held, August 20, 1916. Appearing on the last named date, in response to the notice, Simpson and Smith objected to trial, on the ground of their having filed an appeal to the Grand Chief Engineer from the action of the division at the last preceding meeting. This appeal is in the form of a letter dated, August 18, 1916, and addressed to the Grand Chief Engineer. It denied the validity of the rescission of the results of the former trials and the right of the division to subject the accused parties to another trial. In view of this situation, the division postponed action and directed the secretary to write the Grand Chief Engineer for advice and instruction in the premises. By a letter dated, August 23, 1916, that officer overruled the contention of the accused, and, by another, dated August 26, 1916, advised the division through its secretary, that it had undoubted authority to rescind or set aside the results of the former trials and reopen the cases and proceed with the trial thereof. That trial took place on September 17, 1916, and resulted in the expulsion of Simpson by a vote of twenty-one to ten and Smith by a vote of eighteen to twelve. The evidence, as recorded, was similar to that used on the two former occasions, but more witnesses testified. Mastin is reported as having said the crews might not have been cut so soon, if Simpson and Smith had not been down to the office. Huff was present for the first time, and made an extensive statement but, on his own motion, was excused from voting. On a joint

appeal from these actions, the Grand Chief Engineer declined to reopen the cases, but advised the appellants of their right to appeal from his decision to the next convention, or Grand International Division. Of this last right of appeal, they did not endeavor to avail themselves.

Section 35 of the Standing Rules, under which the charges were preferred, reads as follows: "Any member who by verbal or written communication to railroad officials or others, interferes with a grievance that is in the hands of a Committee, or at any other time makes any suggestion to any official that may cause discord in any Division, shall be expelled as per Sections 49 and 54 of Statutes, when proven guilty; provided, however, this law shall not apply to a Brother in official position when called upon to express an opinion in his official capacity." Section 20 of said rules affirms the right of a committee of the Brotherhood of Locomotive Engineers to handle all questions and matters pertaining to engineers, except such of them as are firemen, working as engineers, they being under the jurisdiction of the committee of the Brotherhood of Locomotive Firemen and Enginemen. The Elk Horn Pool, the dissolution of which by the action of Mastin, alleged to have been induced by the plaintiffs, resulted in the proceedings complained of, affected both classes of engineers, in consequence of which there was a general reduction in rank and position among the engineers and firemen as well as loss of time. In view of this result, the plaintiffs were charged with having violated the Chicago Joint Working Agreement, entered into by the two organizations, the Locomotive Engineers and the Locomotive Firemen. This agreement was operative among the members of the two organizations on the Norfolk & Western Railway, but had not been assented to by the railway company. It is a rather lengthy document and some of its provisions bear directly upon the relations subsisting between the engineers and firemen in the Elk Horn Pool.

Simpson held three certificates or policies of insurance, calling for $4,500.00 and Smith one calling for $1,500.00. Under the rules and regulations of the insurance company by which the certificates had been issued, they were expressly

made valid for a period of one year after the expulsion of
the members to whom issued, but no longer.  The president
of the insurance association, testifying in the case, said the
insurance certificates of the plaintiffs would have been main-
tained by him, on payment of the assessments called for by
them, if appeals had been taken to the Grand International
Division, notwithstanding the lack of express authority to do
so.  The import of his testimony is that formerly the con-
vention or Grand International Division met annually, and
that the provision for continuance of insurance certificates
for one year was designed to keep them in force, after expul-
sion, pending the prosecution of appeals; and that, by an
amendment of the constitution, making the convention trien-
nial instead of annual, the right of maintenance of insurance
pending an appeal had been apparently interfered with by
oversight.  Hence, he says he would have recognized the
certificates and endeavored to keep them in force, if the ex-
pelled members, the plaintiffs here, had taken appeals to the
convention.  Their only reply to this is lack of duty on their
part to take appeals at a period earlier than thirty days be-
fore the meeting of the Grand International Division.  They
tendered assessments for awhile, without appealing, but they
were not accepted.

Section 8 of the constitution requires the Grand Chief
Engineer to devote his entire time to the interest of the
Brotherhood, declares him to be the official head of the order
and expressly vests in him power to exercise full control over
the grand office and the order in general.  It also clothes him
with authority to entertain appeals and makes his decisions
final and conclusive until the triennial meeting of the Grand
International Division.  Section 66 of the statutes provides
that any division wilfully violating any rule or regulation
of the Grand International Brotherhood may have its char-
ter suspended by the Grand Chief Engineer, until the next
meeting of the Grand International Division.  The terms of
these provisions are broad enough to include both executive
or administrative powers and quasi-judicial authority.  Since
the order is composed of its subordinant bodies, as well as
its members, authority vested in the Grand Chief Engineer

to exercise full control over the order in general, may reasonably be construed as carrying a power of visitation and direction over the divisions; and as effectually excluding the theory of lack of authority in this official to act otherwise than upon an appeal formally taken to him. Of course, his power over the order is not absolute nor unlimited. It is vested in him not for purposes of destruction, dissolution or perversion, but to enable him to see that the laws and regulations of the order are enforced and its integrity and efficiency preserved. It would not be unreasonable nor inconsistent with the language of sec. 8, to hold that, on the development of a situation rendering it necessary in his opinion, to make an investigation for the purpose of ascertaining whether a division has violated any rule or regulation of the general organization, by any act of omission or commission, he may institute an inquiry of his own volition and without initiation or suggestion from any other source, and, after having ascertained the facts, determine whether or not the division has wilfully violated any of the rules or regulations, subject to a right of review by the Grand International Division. Such power in the hands of such an organization may be essential to the maintenance of its integrity. Otherwise, a subordinant division might wholly fail to discharge its duties, with impunity, for, by mutual assent, its officers and all of its members might refrain from bringing its wrongful acts to the attention of the superior authority. Irremediable conduct of that kind might soon demoralize the entire association. Section 66 of the Statutes might reasonably be deemed to be an interpretation of a portion of section 8 of the constitution, as well as a means of carrying it into effect. The appellate jurisdiction of the Grand Chief Engineer is not questioned here. It is expressly conferred by section 8 of the constitution. One of the contentions seems to be that he had no authority or power to intervene or interpose in the cases pending in division No. 448 because neither the division, on the one hand, nor the accused members, on the other hand, had prosecuted an appeal, so as to bring the controversy within his jurisdiction as conferred by that section of the constitution, and because he seems to have acted in the mat-

ter at the instance of Huff.   Manifestly, the question thus
raised was one for decision, in the first instance by the Grand
Chief Engineer, and ultimately and finally in the Grand In-
ternational Division, to which an appeal might have been
taken.   If the interpretation of the constitution were, for
all purposes, within the jurisdiction of this court, and the
position taken by the attorneys for the plaintiffs accepted as
sound, it might be adopted as the basis of the decision.   But
the construction of the organic agreement, by-laws, rules
and regulations of a benefit society or other unincorporated
voluntary association belongs, not to the court, but to the
board, council or other tribunal provided for the purpose in
the organization, if any.   So long as the body upon which
this power of interpretation has been conferred does not
substitute legislation for interpretation, nor transgress the
bounds of reason, common sense or fairness, nor contravene
public policy or the laws of the land, in their conclusions
and decisions, the courts cannot interfere with them.   *State
Ex rel. Smith* v. *County Court,* 78 W. Va. 168; *Republican
Executive Committee* v. *County Court,* 68 W. Va. 113; *Bux-
ton* v. *Boggess,* 67 W. Va. 679; *Peyre* v. *Mutual Relief So-
ciety,* 90 Cal. 240; *Screwmen's Benevolent Association* v.
*Benson,* 76 Tex. 552; *Noel* v. *Modern Woodmen of America,*
61 Ill. App. 597; *State* v. *Grand Lodge, K. of P.,* 53 N. J. L.
536; *Burt* v. *Grand Lodge, F. & A. M.,* 44 Mich. 208; *Ana-
costa Tribe No. 12* v. *Murbach,* 13 Md. 91; *Lawson* v. *Hewell,*
118 Cal., 613; *Spilman* v. *Supreme Council,* 157 Mass. 128;
*Connelly* v. *Masonic, Mut. Ben. Asso'n,* 58 Conn. 552; *Levy*
v. *U. S. Grand Lodge,* 30 N. Y. Supp. 885; *Weiss* v. *Musical
Mut. Pro. Union,* 189 Pa. 446; *Schmidt* v. *Abraham Lincoln
Lodge,* 84 Ky. 490; *Ryan* v. *Cudahy,* 49 L. R. A. 353, ex-
haustive note; *Wilcox* v. *Supreme Council, Royal Arcanum,*
210 N. Y. 370; 52 L. R. A. N. S. 806, note.

Practically all of the positions taken in argument, for the
plaintiffs below, are rendered untenable by this general prin-
ciple.   Whether Huff's position as chairman of the General
Adjustment Committee gave him such official interest in the
proceedings pending in the division as justified his complaint
to the Grand Chief Engineer, against the result of its action,

and whether that official was bound to refrain from procedure in the premises, because the information tending in his opinion, to establish evasion of duty on the part of the division, was communicated by Huff, whose alleged animosity toward Simpson may have been known or suspected, are questions of such character as bring them within the provinces of the officers and tribunals of the association for determination. Huff was subordinate to Stone in rank, and authority. The charges made against the plaintiffs related to a matter over which he may have had some authority. Under his diagnosis of the situation, Simpson and Smith had a grievance, deprivation of their right, as senior engineers, to run the electric motors, that should have come up regularly and possibly have passed through the hands of the committee or the local committee whose determinations might directly or indirectly have required action on his part reviewable by Stone. As Chairman of the General Adjustment Committee, he was the highest official of the order on the Norfolk and Western Railway, and, whether directly chargeable with any duty respecting the cutting of the Elk Horn crews or not, the propriety of the dissolution of the Elk Horn Pool was manifestly a matter concerning which he might be called upon to act officially, by way of review or otherwise. Whether he acted strictly within his duty or not, nothing in the rules or regulations forbade his giving his superior information which both deemed to be for the good of the organization, nor acceptance thereof by the latter. Whether their conduct in this respect was proper or not, the written laws of the order leave undetermined, and it was not so unreasonable or unjust as to place it beyond the scope of a reasonable interpretation of the rules and regulations.

Stone's exercise of his power of suspension and appellate jurisdiction conjointly and simultaneously, so as to compel the expulsion of the accused members, or loss of the charter, and thus restrain the liberty of members in respect of their action in the trials is harsh and drastic on its face and decidedly variant from the course of ordinary judicial procedure. But it must be remembered that the association was not formed in absolute accord with the scheme or plan of

state government. The mere reversal of a finding of not guilty by a division would not effect an expulsion of a guilty member. He can be eliminated only by the action of the division itself, and the chief's power over the division is his control of its charter. In what other way could he compel an obdurate division to expel members plainly and indisputably guilty of the most reprehensible conduct? Must the division be permitted, if it so wills, to let all of its rules and regulations become dead letter law and thus make itself an impediment to the maintenance of an efficient organization, an obstruction to the achievement of the social object and a disgrace to the association? It cannot be unreasonable to say the two powers vested in the official head of the organization may be conjointly exercised in plain cases. If they can be so used in such cases, the right to determine whether they may be in doubtful cases necessarily follows, and belongs to the association tribunals, not the courts.

If the members of a division should expel a member on some ground not recognized by the laws, rules and regulations, or without notice or trial, or without any evidence against him, under a threat of suspension of the charter, they might be liable, for purely arbitrary and tyranical action on the part of the official head of the organization would no doubt be inefficacious to protect himself, his association or those acting under his orders. *People* v. *New York Produce Exchange*, 149 N. Y. 401; *Society for Visitation of Sick* v. *Com.*, 52 Pa. St. 125; *People* v. *Young Mens etc. Soc.*, 65 Barb. (N. Y.) 357; *Rex* v. *Faversham*, 8 T. R. 356. Though the plaintiffs denied the charges preferred against them and may not have been guilty, there was some evidence against them. They had been in Mastin's office just before the crews were cut and held a conversation with him in which reference was made to the electric motors and expressed the opinion that they were, or would be, entitled to them. Moreover, they had previously seen Bill, the assistant, who swears they requested assignment to those motors and that he communicated their request to Mastin, before the crews were cut. Keith, another engineer, swears Simpson invitd him to unite with him in a demand for the

electric motors, saying they might be able to "bluff" the railroad officials into complaince with their request. In the new assignments, they got the electric motors. They may not have been guilty, but the existence of evidence against them cannot be successfully denied. Whether it was sufficient or not was a question for the division in the first instance and later for the Grand Chief Engineer, if the Grand International Division concurs in his construction of the constitution and statutes. While his opinion that there was a decided preponderance of evidence against the accused may not have been well founded, the evidence afforded bases for two intelligent and reasonable opinions as to the preponderance thereof. Stone swears he has exercised the powers and authority he applied in these two cases, on previous occasions, without any protest or dissent on the part of the Grand International Division.

Right to expel on the same charges on which the accused has previously been acquitted, under the mandate of a superior officer or tribunal exercising .appellate jurisdiction, depends upon the same principle. It is a question of private social law, either determined by the express terms of the constating instruments, by-laws, rules and regulations, or by fair and reasonable interpretation of provisions thereof, relating to the subject. Neither the constitution, statutes nor rules of the association forbid the placing of an accused member in jeopardy a second time. If, in the absence of any provision on the subject, there is a presumption of intent to adopt this provision of organic state law, it is clearly overthrown by the practically unlimited powers vested in the Grand International Division to whom the Grand Chief Engineer makes his triennial reports, and whose representative and spokesman he is, when that body is not in session. In the absence of an express provision, guaranteeing immunity from second trial for the same offense, the right of interpretation and construction exists and that right is vested in the Grand Chief Engineer. When his decision is reported to the G. I. D., it is subject to the action of that body, which has "exclusive jurisdiction over all subjects pertaining to the Brotherhood," whose "enactments and de-

cisions upon all questions are the supreme law of the Brotherhood," to which "all Divisions and members of the Order shall render true obedience." Con. G. I. B. of L. E. sec. 3. The courts cannot interpose in advance of the decision of a body having such plenary powers and hold that its representative has no power to do what it clearly has power to ratify or order. The powers thus vested in it expressly exclude any presumption of intent to adopt the limitations and rules of the civil laws, respecting either procedure or substantive rights in the order. They do not override legal limitations imposed upon the powers of such organizations, of course, but nothing in the civil law inhibits a second trial of a member of a voluntary association for the same offense, against his will. Ordinarily, the courts deny the existence of any presumption of intent to bind such associations to the modes of procedure prescribed by public law. *Gray* v. *Christian Society*, 157 Mass. 128; *People* v. *St. George Soc.*, 28 Mich. 261; *Kelly* v. *Grand Circle*, 40 Wash. 691; *Marcus* v. *National Council*, 123 Minn. 145; *Kulberg* v. *National Council*, 124 Minn. 437; *Pepin* v. *Societe St. Jean Baptiste*, 24 R. I. 550; *Murry* v. *Supreme Hive*, 112 Tenn. 664. An apparently contrary holding is found in *Com.* v. *Guardians of the Poor*, 6 S. & R. (Pa.) 469. but that was a public corporation governed, as to its organization and rights of members, by public law, not by contract. Moreover, there seems to have been no mode of correction by appeal. The corporation was not a subordinate organization of a larger body having supervisory power over it, and the member expelled had had no notice of the second trial.

The propositions on which these observations stand are obvious corollaries of others to which the courts have yielded practically unanimous assent. The expulsion of a member of a voluntary association, whether incorporated or not, after notice, an opportunity to be heard and a trial fairly conducted agreeably to the laws of the association, is conclusive upon the civil courts. *State ex rel. Smith* v. *County Court*, 78 W. Va. 259; *Boggess* v. *Buxton*, 67 W. Va. 679; *Committee* v. *County Court*, 68 W. Va. 133; *Wilcox* v. *Supreme Council*, 210 N. Y. 370; 52 L. R. A. N. S. 806, note citing

numerous cases. ''Where the society makes provision for the settlement of controversies between it and its members or between its members concerning its government, its dissolution, or its property, courts will refuse to take cognizance of such controversies until those who have grievances, have in the first instance, resorted to and exhausted the remedies provided by the society. * * * * * The mere provision of such a means abridges the right to appeal to the courts, until the prescribed means have been pursued. This rule prevails in matters of discipline, in the expulsion and suspension of members, and arises from the fact that in such cases the controversy springs from the contract of membership, and is a matter of internal regulation.'' Niblack, Ben. Soc. & Acc. Ins., sec. 111; *Smith* v. *County Court,* cited; *Grand Lodge, K. of P.* v. *People,* 60 Ill. App. 550; *Oliver* v. *Hopkins,* 144 Mass. 175; *Zeliff* v. *Grand Lodge, K. of P.,* 53 N. J. L. 536; *Whitty* v. *McCarthy,* 20 R. I. 792.

Whether malice on the part of the members voting for expulsion, under the circumstances stated, would constitute a good cause of action, need not be determined, for there is no evidence of its existence, sufficient to sustain a verdict founded upon it. The trial court correctly so ruled by his peremptory instruction to find for the individual defendants. On the last trials, the vote was taken under the mandate of a superior officer, claiming right and power under the laws of the organization, to annul the acquittals on the ground that they were against the clear weight of evidence, and required the division to expel the accused members. This introduced an entirely new element into the cases. It became necessary for each member to determine for himself whether Stone possessed the authority he claimed and whether the laws of the association required submission to his orders. The change of attitude of members was on its face, a submission to an assertion of superior authority, wherefore it raises no inference of malice or misconduct. Huff and Simpson were not friends. On two previous occasions, they had had altercations, but there is nothing in the evidence tending to prove that Huff was actuated by any ill will, in what he did respecting the charges. He had not attended the first

two trials and, on the last, did no more than explain the reason for his having brought the others to the attention of the Grand Chief Engineer. At his own request, he was excused from voting and there is no proof that he otherwise exercised any personal influence he may have had over other members.

Lack of jurisdiction of the Grand International Brotherhood requires reversal of the judgment, and setting aside of the verdict, against it, but the judgment in favor of the individual defendants must be affirmed, the trial court's instruction to the jury to find for them having been properly given. As nothing can be decided against the association, without jurisdiction, and the judgment in favor of the other defendants is free from error and completely discharges them, there is no occasion to deal with the numerous assignments of error, based upon the other rulings of the court during the progress of the trial. As to the Grand International Brotherhood, the cases will be remanded with leave to the plaintiffs to acquire jurisdiction of its members by proper process and proceed with a new trial, if they shall see fit so to do.

*Affirmed in part. Reversed in part. Remanded.*