# Richmond

BROTHERHOOD OF LOCOMOTIVE ENGINEERS, ET AL. v. D. L. FOLKES, ET AL.

RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY v. D. L. FOLKES, ET AL.

June 22, 1959.

Record Nos. 4908, 4909.

Present, Spratley, Buchanan, Miller, Whittle, Snead and I'Anson, JJ.

The opinion states the case.

*Patrick A. Gibson* and *Francis V. Lowden, Jr.* (*Lewis T. Booker; Harold N. McLaughlin; R. Colston Christian; Wirt P. Marks, III; Hunton, Williams, Gay, Moore & Powell; Hornbeck, Ritter & Victory; Christian, Marks, Scott & Spicer,* on brief), for appellants, Brotherhood of Locomotive Engineers, Et Al.

*R. Colston Christian* (*Patrick A. Gibson; Francis V. Lowden, Jr.; Lewis T. Booker; Harold N. McLaughlin; Wirt P. Marks, III; Hunton, Williams, Gay, Moore & Powell; Hornbeck, Ritter & Victory; Christian, Marks, Scott & Spicer,* on brief), for appellant, Richmond, Fredericksburg and Potomac Railroad Company.

*William C. Parkinson* (*Leith S. Bremner,* on brief), for appellees, D. L. Folkes, Et Al.

SPRATLEY, J., delivered the opinion of the court.

This proceeding was instituted by D. L. Folkes, William F. Cannon and L. O. Holmes against the Brotherhood of Locomotive Engineers, an unincorporated association, L. E. Timberlake, and the Richmond, Fredericksburg and Potomac Railroad Company, a corporation, to enjoin the enforcement of a collective bargaining agreement entered into March 5, 1957, between the defendant Railroad and the Brotherhood of Locomotive Engineers providing for the compulsory retirement of locomotive engineers employed by that Railroad when they attain the age of 70 years.

A temporary injunction was granted, and on December 3, 1957, after the introduction of oral and documentary evidence, the injunction was made permanent. We awarded separate writs of error, one to the Brotherhood of Locomotive Engineers, hereinafter referred to as Brotherhood, and L. E. Timberlake (Record No. 4908), and the other to Richmond, Fredericksburg and Potomac Railroad Company, hereinafter referred to as R. F. & P. or Railroad, (Record No. 4909). In each instance the facts are the same, involve the same general principles, and give rise to the same question. That question is whether the trial court erred in holding that the agreement of March 5, 1957, was invalid and ineffective because of the failure of the bargaining agents of the Brotherhood to comply with the rules and procedure prescribed by the laws and regulations of the Brotherhood.

The National body of the Brotherhood is known as the Grand International Division, and is referred to in its Constitution as the G. I. D. Local unions of the Brotherhood are known as Divisions and assigned a number.

Appellees, Folkes, Cannon and Holmes are locomotive engineers in the employ of the R. F. & P. At the time of the trial two of them were approximately 70 years of age and the third was 72 years old. They are members of Local Division No. 561 of the Brotherhood, with principal office at Richmond, Virginia. L. E. Timberlake is a locomotive engineer, who has been engaged in the service of R. F. & P. for more than 39 years. He is a member of Division No. 561, and the Chairman of the General Committee of Adjustment of the Brotherhood, the bargaining agent of the Brotherhood.

Section 2(a) of the Constitution of the Brotherhood reads as follows:

"In Convention assembled, the supreme governing body of the G. I. D. of the B. L. E. shall be composed of the Grand Chief Engineer, First Assistant Grand Chief Engineer, sixteen other Assistant Grand Chief Engineers, * * * and the number of delegates required by law, as set forth in Section 21, Constitution—representation of Divisions to G. I. D."

The duties of the Grand Chief Engineer are set out in Section 7 of the Constitution. The following provisions are pertinent:

"Sec. 7 (a) * * * Between Triennial Conventions of the G. I. D., the Grand Chief Engineer shall be recognized as the G. I. D. and have authority to make any decision and perform any act or duty on behalf of the G. I. D. and such decision or act will stand as law for all Divisions and Members unless repealed by the G. I. D. in Convention assembled or in accordance with the provisions of Section 4, Constitution.

"(b) He shall interpret the law of the G. I. D. according to its plain and obvious meaning, decide controversies which may be appealed from divisions and after a careful examination of the subject he shall make out and forward to the divisions making the appeal his written decision in the case, and such decision shall be final and conclusive until the Triennial Convention of the G. I. D., at which time the aggrieved member may appeal to the G. I. D., * * *."

Section 14 (a) of the Constitution provides that the Grand Chief Engineer, First Assistant Grand Chief Engineer, sixteen Assistant Grand Chief Engineers, General Secretary-Treasurer, the Editor and

Manager of the "Journal," "shall constitute an Advisory Board on matters pertaining to the welfare of the Brotherhood * * *."

In Section 14 (d), the Grand Chief Engineer is made Chairman of the Board when convened, and may convene the Board, "when, in his judgment, he deems it necessary or by request of a majority of the members of the Board." The members of the Board are located in various stations in the United States and Canada. The Board meets only once a year, unless there is reason for a special meeting.

The Brotherhood has also adopted certain "Statutes" and a set of Standing Rules.

Section 45 (c) of the "Standing Rules," dealing principally with the operation of General Committees of Adjustment provides, in part, as follows:

"All General Committees of Adjustment are prohibited from making agreements with the railroad managements, the terms of which will conflict with any law or policy adopted by the G. I. D., without first submitting same to the Grand Chief Engineer, who, in conjunction with the Advisory Board will determine proper disposition of the question at issue. * * *"

Article 32 in a "Handbook" entitled "Rules and Regulations for Local Engineers employed by R. F. & P.," provides that:

"The General Committee of Adjustment of the Brotherhood of Locomotive Engineers will represent all local engineers in the making of contracts, rules, rates and working conditions, and the interpretations thereof."

At the Thirteenth Triennial Convention of the Brotherhood, held in 1956, the question of the adoption of a rule relating to the policy of the Brotherhood as to retirement of engineers was discussed on several occasions. A proposed resolution providing that the retirement of engineers not be made compulsory at any age was rejected. Also rejected was a resolution to amend a section of the "Standing Rules" by providing for compulsory retirement at the age of 65. Eventually a member proposed from the floor of the Convention the following Resolution No. 42:

"Before any compulsory retirement agreement is made on any system or road, the General Committee of Adjustment will be required to take a referendum vote of the membership (as defined in Section 29 (a) Statutes) on the road or system; and should the referendum vote be in the affirmative by a majority an agreement must be reached with the carrier, that the carrier will provide for a non-

cancellable supplemental pension before the mandate of the referendum vote can be made effective. Section 37 (b) of the Statutes is so modified hereby."

Grand Chief Engineer Guy L. Brown, who was presiding over the Convention assembled, ruled the resolution out of order, because it purported to amend Section 37 (b) of the Statutes of the Brotherhood, without having been first submitted to the Committee on the Constitution and By-Laws, as required by the basic laws of the Brotherhood. A few moments later the resolution was re-offered with reference to the statute (37 (b)) stricken out. Then after the Grand Chief Engineer and the author of the resolution stated to the Convention that the resolution was to be accepted and considered merely as "a declaration of policy of the organization," the revised resolution was put to a vote and adopted without further discussion.*

At a meeting of the Local Union, Division 561, on November 7, 1956, a resolution reading, in part, as follows, was offered and adopted by a vote of 8 to 6:

"Whereas, many railroads and their employees have agreed that all employees must retire at the age of seventy years:

"Therefore, be it resolved that the matter of compelling all enginemen employed by the Richmond, Fredericksburg and Potomac Railroad to retire at the age of 70 years, be submitted to a referendum vote of such employees, that the ballots for said referendum vote be mailed to such employees at the very earliest date and not later than December 1, 1956, and if such vote is in favor of compulsory retirement at 70 years of age, the Committee is therefore instructed and authorized to negotiate a rule with the management of the Railroad requiring all enginemen to retire at age 70 if such employees do not retire before reaching that age."

The resolution contained no reference to a suppleemntal pension and, thereupon, an amendment was immediately offered to require the carrier to provide for a non-cancellable supplemental pension before the mandate of the referendum could become effective. The amendment was defeated.

The defendant, Timberlake, wrote to Grand Chief Engineer Brown on November 17, 1956, and enclosed in his letter a copy of the above Resolution. He set out further the proceedings of the meeting of November 7, 1956, the fact that the proposed amendment to the

---

* Proceedings Thirteenth Triennial Convention G. I. D. Brotherhood of Locomotive Engineers, June 11-17, 1956, pages 882-883.

Resolution was defeated; stated that R. F. & P. had advised him, in writing, that it could not accede to the request for a supplemental pension; that the Brotherhood of Locomotive Engineers was the only operating craft on the R. F. & P. that did not have compulsory retirement at 70 years; and asked for the advice and ruling of the Grand Chief Engineer, pursuant to Section 45 (c) of the "Standing Rules" and the requirements of Resolution No. 42.

Brown replied to Timberlake on November 26, 1956, as follows:

"In your letter of November 17, 1956, you state that during regular meeting of Division 561 a resolution was presented and adopted providing that the General Committee of Adjustment negotiate a compulsory retirement agreement with the railroad management; further, that the question be referred to the division membership by referendum ballot.

"I note you refer to Resolution 42 adopted by the 13th Triennial Convention which requires that before a General Committee can negotiate a compulsory retirement agreement the question must be referred to the system membership for their approval and, in addition, the agreement negotiated with the railroad management must contain a provision for a 'non-cancellable' supplemental pension plan.

"You ask if it would be advisable to furnish a copy of Resolution 42 with the referendum ballot for the guidance of the membership. I will advise that this procedure would be in order.

"You advise that all General Chairmen representing employees of the R. F. & P. Railroad met with the management on July 15, 1956, for the purpose of negotiating a supplemental pension plan similar to the one in effect on the Pennsylvania Railroad. As of this date, having failed to reach agreement with the management, the matter is status quo.

"Dealing with the governing features of Resolution 42, I wish to direct attention to all concerned that the resolution, not having been incorporated in the Constitution and By-Laws as a governing law, merely establishes a policy to govern General Committees of Adjustment in negotiating compulsory retirement agreements. Realizing the fact that subjects of a negotiable nature are subject to change and modification during the procedure of negotiation, the policy set forth in this resolution would be governing as follows: The General Committee is required to take a referendum vote of the system membership and must, if a majority of the members favor

the agreement, make formal request and persuasive argument for a non-cancellable pension plan.

"In the event that the committee is unsuccessful in obtaining the non-cancellable feature, then, of course, it is in a position to modify the request by adopting the best plan possible.

"Trusting the foregoing will be of assistance to your committee in further handling this question, I remain, * * *."

A copy of the above letter was placed in the Brotherhood's file and copies furnished to the officers of Division No. 561.

In observance of a by-law of Division 561 providing that action taken at any meeting might be reconsidered at a subsequent meeting, ballots were not distributed until after the regular December meeting of the Division. At the December meeting, Brown's letter of November 26, 1956, to Timberlake, was read in full to the membership present. No motion for reconsideration of the Resolution was offered. Thereafter, official ballots were distributed to all members of Division 561, presenting the sole question whether or not the member was for or against compulsory retirement at the age of 70 years. The ballots were to be signed by the members and returned not later than January 1, 1957.

Timberlake testified that no reference was made in the ballot to Resolution No. 42, because he thought it might mislead someone; and that, at any rate, the referendum was directed by the resolution of Division 561 solely to the question whether or not the members of the Division were in favor of compulsory retirement at 70 years of age. The ballots were returned by January 1, 1957, and at the regular monthly meeting held on the following day were counted, with the result showing 64 votes in favor of compulsory retirement at age 70 and 60 against.

Timberlake, under date of January 7, 1957, informed Brown, by letter, of the result of the balloting by Division 561, and requested instructions. In the meantime, on January 3, 1957, the Advisory Board of the G. I. D. had begun its regular annual meeting. At that meeting Brown reported to the Board the ruling he had made with respect to the request of Timberlake, along with similar actions taken by him with respect to other railroads. No objection or exception was raised by the Board or any of its members.

Brown testified, in part, as follows:

"Q. How have you in practice proceeded in acting under Sec. 45 (c) as to action in conjunction with the Advisory Board?

"A. The practice has been to give the ruling, and when the Advisory Board is convened in their regular session, the Grand Chief Engineer makes the report to them, usually a verbal report on the various matters, such as this, and describes it. Sometimes there are discussions and other times there are no comments whatsoever made, which has always been accepted as the Advisory Board's concurrence.

*    *    *    *    *    *    *

"Q. Did you, Mr. Brown, handle your ruling November, 1956, in any manner differently from your other actions under Sec. 45 (c) as to action in conjunction with the Advisory Board?

"A. I handled it no differently from my previous action to the action of my predecessor in this office in making the report to the Advisory Board."

He also said that rulings under Section 45 (c) of the "Standing Rules" frequently occurred, often daily.

Timberlake, on behalf of the Brotherhood, renewed negotiations in January, 1957, with Railroad for a supplemental pension. Railroad said that it would agree to compulsory retirement, but not to a supplemental pension. Timberlake wrote to Grand Chief Engineer Brown on January 20, 1957, advising him of the situation, and requested further advice and aid. Enclosed in his letter was a copy of the memorandum of the agreement proposed to be entered into between the Brotherhood and R. F. & P., omitting any mention of supplemental pension. Upon its receipt, Brown directed J. W. Turner, an Assistant Grand Chief Engineer, to go to Richmond, Virginia, and assist Timberlake in making a satisfactory agreement with Railroad.

On February 8, 1957, Timberlake again wrote Brown, setting out the circumstances in full, and requested advice as to whether his Committee could make an agreement with R. F. & P. for compulsory retirement at the age of 70 without any form of supplemental pension. Brown replied to Timberlake on February 14, 1957. In that letter he said:

"In reply I will advise that Resolution 42 of the G. I. D., like Section 38 of the Standing Rules, Constitution and By-Laws, is a matter of policy rather than law as both deal with subjects of negotiable nature and must be flexible to permit a G. C. A. to consummate the best agreement possible with its management.

"Of course, it is mandatory under the law, specifically Resolution

42, that the G. C. A. vote the system membership without deviation. I would understand that this procedure has prevailed on your property and that the only question remaining is whether you are in a position to negotiate the compulsory retirement agreement, excluding the supplemental pension plan in conformance with the requirements of G. I. D. law and policy.

"You will understand that every effort must be made to establish the pension plan, even through the assignment of a Grand Officer. Should all efforts fail, then, of course, your committee may, if it so desires, negotiate the 70 year compulsory retirement agreement."

On February 18, Turner, the Assistant Grand Chief Engineer, wrote Brown that he had been to Richmond, and undertaken to assist the General Committee of Adjustment in obtaining a supplemental pension plan, and that, "Every effort has been made to establish the supplemental pension plan to no avail as the management positively declines to accede to our request."

Faced with a stalemate in its efforts to obtain a supplemental pension, the General Committee of Adjustment, following the determination of the Grand Chief Engineer, entered, on March 5, 1957, into an agreement with R. F. & P. for compulsory retirement of employees represented by the Brotherhood of Locomotive Engineers when they reached the age of 70 years. Timberlake reported this action of his Committee, and the reasons therefor, to Division 561 at its regular meeting March 6, 1957. At that meeting, a copy of the agreement with R. F. & P., the one here involved, was read to the members present, a copy given to each, and a copy filed with the records of the Division. Thereupon, according to the minutes, a motion that the "agreement stand as drawn up without any exception," was made and adopted. The record shows no appeal therefrom to the G. I. D.

It is conceded that compulsory retirement, in the absence of a resolution or rule to the contrary, is a proper subject for collective bargaining. It is not disputed that the provisions of Resolution No. 42 can be waived and a contract similar to the one here involved validly executed. The appellees rely upon their contention that the procedure and provisions of Resolution No. 42 were "not complied with or properly waived."

The learned trial judge in a written opinion held that the evidence failed to show that the Grand Chief Engineer acted "in conjunction with the Advisory Board" in determining the proper disposition of

the question at issue. His conclusion is based upon his interpretation of the phrase "in conjunction with," under the view that the phrase required the Grand Chief Engineer to obtain the advice and active concurrence of the Board in rulings. He substituted his own interpretation for the construction placed upon the organic laws, rules and regulations of the Brotherhood by the tribunal provided by that organization for such purpose.

■ It is well established that "the construction of the organic agreement, by-laws, rules and regulations of a benefit society or other unincorporated voluntary association belongs, not to the court, but to the board, council or other tribunal provided for the purpose in the organization, if any. So long as the body upon which this power of interpretation has been conferred does not substitute legislation for interpretation, nor transgress the bounds of reason, common sense, or fairness, nor contravene public policy or the laws of the land, in their conclusions and decisions, the courts cannot interfere with them." *Simpson* v. *Grand International Brotherhood of Locomotive Engineers*, (1919) 83 W. Va. 355, 98 S. E. 580, 587 and cases cited, (Cert. Den.) 250 U.S. 644, 39 S. Ct. 494, 63 L. ed. 1186.

See also *Harris* v. *Missouri Pacific R. Co.*, D. C. (1931) 1 F. Supp. 946; *Louisville & Nashville R. Co.* v. *Miller*, (1941) 219 Ind. 389, 38 N. E. 2d 239, 142 A. L. R. 1050, (Cert. Den.) 317 U. S. 644, 63 S. Ct. 36, 87 L. ed. 519; *Norfolk & Western Ry. Co.* v. *Harris*, (1935) 260 Ky. 132, 84 S. W. 2d 69; *Weinstock* v. *Ladisky*, (1950) 98 N. Y. S. 2d 85, 197 Misc. 859; *Bradford* v. *Grand International Brotherhood of Locomotive Engineers*, (1937) 188 La. 819, 178 So. 362; *Shaup* v. *Grand International Brotherhood of Locomotive Engineers*, (1931) 223 Ala. 202, 135 So. 327. Cf. Annotation 142 A. L. R., page 1055, *et seq.*

The rule is aptly stated in 87 C. J. S., § 13, page 776, where it is said:

"The construction of a union's constitution and laws is for the union, through its appropriate board or officers; and the courts will accept such construction in the absence of fraud, illegality, or improper exercise of the power of construction."

■ The G. I. D. is the supreme governing body of the Brotherhood under its Constitution. In promoting the welfare of its organization, it may, in convention assembled, enact laws, by-laws, and resolutions fixing its government and its policies. It may repeal such enact-

ments and may suspend or waive express policies whenever it deems best for the welfare of its Brotherhood.

Under Section 7 of the Constitution, the Brotherhood has conferred, between triennial conventions, all of the authority of the G. I. D. upon the Grand Chief Engineer, and provided that his "decision or act will stand as law for all Divisions and Members unless repealed by the G. I. D. in Convention assembled or in accordance with the provisions of Section 4, Constitution." The broad and general powers given the Grand Chief Engineer constitute him the *alter ego* of the G. I. D., in the interval between conventions, vested with authority to sanction or prohibit an agreement in conflict with any law or policy of the Brotherhood.

Moreover, under Section 45 (c) of its "Standing Rules," it has specifically provided how a waiver of its laws and policies may be effected. In that section it has recognized the necessity of a waiver where collective bargaining has reached a stalemate because of a conflict between the demands and rights of the contracting parties.

It is uncontradicted that Resolution No. 42 was intended to be, and was adopted, not as an amendment to the basic laws of the Brotherhood, but as a declaration of policy in negotiating retirement agreements between the Brotherhood and Railroad managements. It imposes a policy limitation upon the bargaining committee of the Brotherhood; but it does not and cannot establish a rule of policy which the employer must follow. The resolution must be considered in connection with "Standing Rule" 45 (c), which provides an escape from the declared policy of Resolution No. 42 when the employer positively refuses to adopt it also.

Here, the Grand Chief Engineer, moreover, reported his decision to the Advisory Board, giving to it an opportunity to comment, criticize, assent or dissent. The Advisory Board acquiesced therein tacitly, or passively, by refraining from criticism and dissent. Before the execution of the agreement involved, he made a second ruling reiterating his prior decision to the Advisory Board, without objection from it. This procedure was in accordance with the interpretation placed upon the words "in conjunction with," by the Grand Chief Engineer and his predecessors in office, in the light of many years of experience in collective bargaining. That interpretation by the officers of the Brotherhood, adopted continuously and constantly, in the performance of their duties, is a permissible con-

struction, and we are of opinion that it should be given full effect under the circumstances here.

For the reasons stated, the decree of the trial court is reversed; the injunction of December 3, 1957, dissolved; and the proceedings dismissed at the cost of the appellees.

*Reversed; injunction dissolved; and proceedings dismissed.*