UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA v. CARPENTERS LOCAL UNION NO. 14 OF UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA.

No. 11363.

Court of Civil Appeals of Texas. San Antonio.

Dec. 8, 1943.

On Rehearing Jan. 26, 1944.

W. H. Reid, of Dallas, and Johnson & Rogers, of San Antonio, for appellant.

Van Henry Archer, Sam G. Newton, and Carlos C. Cadena, all of San Antonio, for appellee.

PER CURIAM.

This is a suit between "United Brotherhood of Carpenters and Joiners of America," a voluntary unincorporated association, and a subordinate body thereof, known as "Local Union No. 14, of the United Brotherhood of Carpenters and Joiners of America," which is likewise a voluntary unincorporated association. The parent or general organization will be referred to as "United Brotherhood," or appellant, while the subordinate body will be referred to as "Local 14," or appellee.

Both litigants apparently brought their respective suits and cross-suits under and by virtue of the provisions of Rule 28, Texas R.C.P. The capacity of either party to sue and be sued is not questioned by its adversary. No individual appears in this controversy seeking to protect his personal or property rights as a member of Local 14, or of the United Brotherhood.

The United Brotherhood brought this suit contending that Local 14 had been suspended by the parent association and sought to enforce, by way of mandatory injunction, the provisions of Section 30–A

of the General Laws of the United Brotherhood, which provide that: "If at any time a Local Union should * * * be suspended * * * all property, books, charter and funds held by, or in the name of, or on behalf of said Local Union must be forwarded immediately by express to the General Secretary, to be held in safekeeping for the United Brotherhood as Trustee for the carpenters in that locality until such time as they shall reorganize."

Local 14, by way of cross-complaint, asserted that the suspension order directed against it was wholly void, and prayed for a writ of mandamus directing the United Brotherhood to reinstate Local 14 as a body in good standing with all rights and privileges incidental to such membership.

After a trial before the court without a jury judgment was rendered awarding a writ of mandamus in favor of Local 14, together with injunctive relief restraining the United Brotherhood as Trustee from attempting to take over the books, property, funds, etc. of Local No. 14. Upon request, findings of fact and conclusions of law were filed. The United Brotherhood has appealed and here presents fifty-one points of error. The greater part of these points are directed againt particular findings of fact and conclusions of law made by the trial court, in accordance with proper briefing practice under the Rules of Civil Procedure. See Rule 418, R.C.P.

This controversy had its origin in a dispute between the members of Local 14, which finally culminated in a decision by Local 14 to refuse to abide by and recognize a ruling of the General President of the United Brotherhood. This action was taken at a meeting of Local 14 in which, out of a membership of some 1700 persons, only 140 members voted; 43 voting to recognize the ruling of the General President and 97 voting to the contrary.

The controlling questions in the case relate to the powers and authority of the General President, under the constitution and laws of the United Brotherhood, and the extent of the authority of the civil courts to interfere with the internal workings of a voluntary unincorporated association.

The facts are somewhat involved. We are unable to agree entirely with the findings of the trial court, and it would unduly lengthen this opinion to consider and discuss each of appellant's points with reference to the particular findings of the trial court attacked thereby. We therefore make the following findings of fact which are either based upon the findings of the trial court, or are, in our opinion, conclusively established by the evidence.

The governing laws or rules of the United Brotherhood consist of the Constitution (Sections 1 to 17, inclusive), the General By-Laws (Sections 18 to 24, inclusive) and the General Laws (Sections 25 to 65, inclusive). By Section 25–A of the General Laws, Local Unions are empowered to promulgate trade and working rules, subject to the approval of the First General Vice-President.

Section 43–K of the General Laws provides that "no member of this United Brotherhood will be allowed to violate the Trade Rules of the locality in which he works."

Section 43–N provides that "Any violation of the three preceding sections (which includes 43–N) shall be punishable by a fine of not less than Five Dollars ($5.00) or by expulsion, or both."

Section 55–C provides that "Any officer or member who * * * violates the Trade Rules of the locality in which he is working * * * shall be fined, suspended or expelled, as the Local Union may decide."

Local 14 duly adopted, with the approval of the First General Vice-President, certain trade and working rules, effective as of November 1, 1938, which contained the following provisions:

Article 14, Section 10, Trade Rules. "No carpenter shall at any time work on a job where non-union carpenters are employed, unless they have applications for membership pending; no carpenter shall work for any contractor who employs non-union carpenters."

Section 1, Working Rules. "No member shall be permitted to work for any employer who gives employment to non-union carpenters; for violation of this section a member is subject to a fine of twenty-five ($25.00) dollars."

The United Brotherhood is affiliated as an international organization with the American Federation of Labor. Shortly after the Japanese attack upon Pearl Harbor and the entry of the United States into the war now in progress, the Building

Trades Department of the American Federation of Labor agreed with governmental agencies having charge of the constructions on military installations, that there would be no strikes upon such projects by union workmen under its jurisdiction during the war emergency. This agreement is commonly referred to as the "no-strike pledge."

During the early part of 1942, the H. B. Zachry Construction Company, as contractor under an agreement with an agency of the United States Government, began work upon a military installation at Hondo, Texas, which was intended for and is now being used for the purpose of training members of the Army Air Forces of the United States.

The Zachry Company also secured a contract from a governmental agency to construct a military installation for the use of the Army Air Forces at Laredo, Texas; this installation being known as the Laredo Aerial Gunnery School. Work upon the Laredo project was begun sometime after the commencement of work upon the Hondo job, and workmen were transferred by the Zachry Company from Hondo to Laredo.

Both jobs were within the territorial jurisdiction of Local 14. The Zachry Company maintained what is known as an "open shop," that is, the company did not require as a condition of employment that applicants be members of a labor union, or that they not be members of a labor union. The construction company did agree, however, that it would not interfere with Local 14, or the United Brotherhood in their attempts to recruit members among the carpenters working upon the projects.

During the latter part of 1942, certain members of Local 14 preferred charges against I. G. Paul and some twenty-four other members of Local 14, accusing them of violation of the trade rule of the Local, above set out. As a result of these charge, all twenty-five of the accused were convicted; and the majority of them, including Paul, were fined $25.00 and suspended for a period of one year. Paul was fined and suspended on September 28, 1942. On January 28, 1943, he wrote the following letter to the United Brotherhood of Carpenters and Joiners of America at their headquarters in Indianapolis, Indiana, directed to the attention of R. E. Roberts, a member of the Executive Board of the United Brotherhood:

"United Brotherhood of Carpenters & Joiners of America,

"Indianapolis, Ind.

"Att. Mr. Bob Roberts.

"Dear Sir:

"On or about April 1st, 1942, the carpenters local #14 of San Antonio, Texas, authorized myself and carpenters to go to Hondo, Texas, to build an Airport for the H. B. Zachry Co. and our United States government. For the purpose of trying to unionize this Co.

"The H. B. Zachry Co. furnished a representative of this local union, a Mr. Wiley Howell, an office and done everything in their power to help him with matters.

"In going on this project I was immediately made an area Supt. along with a Mr. W. W. Cooley, Local #1423, and Mr. Ralph James, who was asst. project mgr., Local #14 and numerous carpenter foremen from San Antonio and vicinity.

"We had about 175 union carpenters on this project and recruited a good number of new members. We did wonders in getting rid of all non union men and hiring union members. This statement can be substantiated by Mr. Howell. We had just about convinced this said Co. that we could give them the best class of workmanship with union help and they gave us a free reign in hiring and firing.

"Upon nearing completion of this project, they were awarded a contract to erect a gunnery school at Laredo, Texas. Ourselves and men transferred to Laredo not knowing the local did not want us on this project. And not expecting them to tear down the good work we had been doing for them.

"After working three weeks the Bus. Representative and President of Local #14 came to Laredo and wanted to pull all the men off of this project. The members being true blooded Americans did not feel that this should happen at this time to stop our progress to help win this war and stayed on the job thinking the rank and file of the organization would stand in back of them. Especially during this time when all men are needed.

"Our Bus. Representative never did contact me during his stay in Laredo and never did notify the men to come off this job except a few he met on the streets and at the Laredo Nat. Bank. I have a complete copy of all testimony at our trial and

the above statement was made by himself, Mr. H. N. Johnson.

"On Aug. 24, 1942, myself and 14 other members recd. a copy of charges preferred against us for violation of Art. 14, Sect. 10.

"On Aug. 26th we received letters from the recording sect'y. notifying us to be present on Sept. 1, at which time the trial committee was drawn.

"We had already made two trips from Laredo to San Antonio in regard to this case and there were seven of us present at the trial. The committee acted and we were never notified of their action. We firmly believe being members as long as we had we were at least entitled to the courtesy of knowing what the findings of the committee were, so we could make an appeal to General Headquarters.

"We are now making an appeal although we fully realize it may be too late. We are not asking for a rescindment of our fine but just to be reinstated and enrolled on the books again.

"We fully believe our case against us was nothing but pure prejudice and want to do our part in helping to defeat our enemies.

"Out of 266 union members present on this Laredo project there were only 22 men had charges preferred against them. And in all fairness to us we feel that all of them were as guilty as we were. Why did the San Antonio local single us out of that amount and not bother the rest? Also, if we were guilty of working on the Laredo project we were equally as guilty for working at Hondo.

"One of the members, A. Krueger, after being fined and suspended along with us, and as guilty as we were, quit the job and the local rescinded the action against him.

"Another stayed until the completion of the job at Laredo. Having heard they had charges against him he also stated he had quit and the charges were dropped.

"Why, in the first place, did this local union allow us to work at Hondo? Why did they allow union men to work on Zachry's office bldg. in San Antonio, while the Laredo job was in progress? We can name the two union members who worked on this job.

"The United States Employment Bureau does not see why this local union wants to keep skilled mechanics off of govt. projects at this great time, when men are needed so badly.

"A number of the ex members have contacted the United States Empl. Bureau in regard to this local union keeping them off of govt. work and want to send the matter to the Atty. Gen. of the United States and the Fed. Bureau of Investigation. I have talked these into holding off until we could get a reply from the International.

"Again we are asking you to take heed to our appeal and to help us to the best of your ability. Thanking you for an immediate reply.

"Respectfully yours,

"I. G. Paul"

Another suspended member of Local 14, C. J. Deavers, wrote to Wm. L. Hutcheson, General President of the United Brotherhood, under date of February 23, 1943. Deavers claimed that he had no notice of his suspension order until his tendered payment of dues was refused. He asserted that the Laredo job was "ninety-five per cent union men"; that he had been a union man for thirty years and had been advised by old union members to write the General President and state the facts, as his suspension was unconstitutional and not according to the by-laws.

As a result of these letters, William L. Hutcheson, General President of the United Brotherhood, assigned Board Member R. E. Roberts to investigate and report to him concerning the matter.

After receiving a report from Roberts, the General President eliminated the order of suspension assessed against the carpenters accused of violation of the trade rules above set out and notified Local 14 of his action by means of the following letter:

"March 27, 1943

"Mr. H. T. DeHart, R. S.,
"Local Union No. 14,
"Rte. 9, Box 149,
"San Antonio, Texas.
"Dear Sir and Brother:

"The matter of your Local Union fining several members has been brought to my attention and it was referred to Board Member R. E. Roberts.

"After making an investigation he reports he found that the men had been warned of the action of Local 14, which was that they would not recognize an open shop condition on the job in question, and that it further developed that at the time

these members went to work at Laredo they could have been employed at San Antonio on several jobs under strictly union conditions.

"He recommended, however, that the penalty of suspension be withdrawn, and the men be permitted to pay the fines, also to pay up their back dues and be placed in good standing three months after making such payments. Of course it will be necessary that these men pay the fines and dues within thirty days of this date.

"Therefore, in conformity with his recommendations I hereby declare that the following members each be fined in the sum of $25.00 each, and all reference to suspension be eliminated: (here follows the names of the carpenters affected).

"We would appreciate your notifying the above listed members of this action as we do not have the addresses of all members involved.

"Fraternally yours,
"Wm. L. Hutcheson
"General President"

The General President was informed that Local Union No. 14 had refused to abide by his ruling of March 27th, and as a result sent the following telegram to the secretary of the local union:

"April 8, 1943
"H. T. DeHart,
"c/o Paul Biels,
"126 North Street,
"San Antonio, Texas.
"I am in receipt of a telegram from I. G. Paul setting forth that Local Union 14 will not abide by the communication sent your Local by the undersigned under date of March 27, 1943. The purpose of this communication is to notify you and through you the members of Local Union 14 to comply with the contents of that communication at once and so notify us at the General Office.

"Wm. L. Hutcheson
"General President"

The recording secretary in turn wired the General President as follows:

"April 9 AM 6:09
"Wm. L. Hutcheson, Gen. Pres. United Brotherhood of Carpenters and Joiners of America, Indpls.

"We are in receipt of your telegram of April 8, 1943. I called a meeting of all the officers of the local to meet at 7:30 PM in the carpenters office. It was moved that we wire the Gen. Pres. that we are perfecting an appeal to the Gen. Executive Board from the decision of the Gen. Pres. and for which we have a period of thirty days from the date of the first communication from the Gen. Pres. the motion carried 7 for 3 against. At a quarterly called meeting, held April 6th, 1943, the membership present voted 116 to reject your decision and 5 to concur in it, at this meeting a committee of five or 6 members were appointed to draft an appeal.

"Henry T. DeHart Rec. Secy.
Carpenters
"Local Union #14 126 North St."

The General President, on April 15, 1943, wrote the Local Union as follows:

"April 15, 1943
"Mr. H. T. DeHart, R. S.,
"Local Union No. 14,
"126 North Street,
"San Antonio, Texas.
"Dear Sir and Brother:

"This will acknowledge receipt of your telegram of April 8th, wherein you set forth that on receipt of the telegram from the undersigned on that date, you called a meeting of the officers of the Local Union at 7:30 P. M. and it was moved that you wire the General President you are perfecting an appeal to the General Executive Board from the decision of the General President and for which you have a period of thirty days from the date of the first communication from the General President, and that the motion carried seven for, and three against. In your wire you also state that at a quarterly meeting held April 6th, the membership present voted 116 to reject my decision and 5 to concur in it, and at this meeting a committee was appointed to draft an appeal.

"The purpose of this communication is to inform you, and through you the members of Local Union 14, San Antonio, that while it is permissible for a Local Union, a member, or a group of members, to appeal from the findings or rulings, or decisions made by the undersigned, yet it is necessary that before the appeal will be considered by the General Executive Board that the member, members, or Local Union must comply with the finding or decision rendered. Therefore, before your Local Union can take an appeal to the General Executive Board it will be necessary that you comply with the instructions contained in the communication of March 27, 1943.

"I am instructing Board Member Roberts to proceed to your city at once, to arrange for a special called meeting of the members of your Local Union in order to give the members an opportunity to vote, either for compliance with the instructions contained in the letter of March 27th or oppose compliance. I trust that the members will see the advisability of complying with the laws, rules, and regulations, and with instructions issued, so as to obviate the necessity of further action by the undersigned.

"Fraternally yours,
"Wm. L. Hutcheson
"General President"

The General President also delivered the following instructions to Board Member Roberts:

"April 15, 1943

"Mr. R. E. Roberts,
"222 E. Michigan St.,
"Indianapolis, Indiana.
"Dear Sir and Brother:

"You will find herewith enclosed a copy of communication I am this day sending to Local Union 14, San Antonio, Texas, by registered mail.

"It is my desire that you arrange to go to that city at once, arrange for a special called meeting and take a roll call vote of the members, as to whether they are willing to comply with instructions issued by the General President or whether they are in favor of non compliance.

"Take this roll call vote in such a manner, so that as the member answers his name he votes either yes or no to concur with the instructions issued, and furnish me with a copy of the vote showing how each member voted.

"If the majority does not vote in favor of concurring with the instructions issued then you are to notify them that the Local Union is suspended, and you are to take charge of the charter, books, papers, etc., of the Local Union.

"Fraternally yours,
"Wm. L. Hutcheson
"General President"

At a called meeting of Local No. 14, held on April 20, 1943, R. E. Roberts read his letter of instructions from the General President. The ruling of the General President concerning the suspension of the members involved was likewise read. A motion was made that Local 14 abide by the ruling of the General President. The motion was lost by a vote of 97 to 43.

Roberts then announced that by reason of the vote and under instructions of the General President, Local Union No. 14 was suspended from the parent organization.

A motion was then passed instructing the trustees of the local "to go before the courts and file injunctions restraining the General Office from taking over the property of the Local."

Such suit was filed in the 37th District Court of Bexar County, but was abated upon the ground that the Local Union had not exhausted all of its remedies within the organization and could not therefore resort to the civil courts for relief. No appeal was taken from this decision.

However, Local 14 did attempt an appeal within the organization from both orders of the General President, i. e., the order relieving the accused carpenters of the suspension ordered by the local union, and the order suspending the local union. Copies of the appeals were mailed to the General Secretary and the General President, but they were returned marked "Refused." Thereafter, this suit was filed by the United Brotherhood.

In addition to the provisions of the laws of the United Brotherhood heretofore set out, the following excerpts from the Constitution and Laws of the organization are deemed applicable:

Relating to the jurisdiction of the United Brotherhood:

"The jurisdiction of the United Brotherhood of Carpenters and Joiners of America shall include all branches of the Carpenter and Joiner trade. In it shall be vested the power through the International Body to establish and charter Subordinate Local and Auxiliary Unions, District, State and Provincial Councils in all branches of the trade, and all other skilled employes working at the industry, and its mandates must be observed and obeyed at all times." Section 6 A Constitution.

"The right is reserved to the United Brotherhood through the International Body to regulate and determine all matters pertaining to fellowship in its various branches and kindred trades." Section 6 B Constitution.

Relating to the powers and authority of the General President:

"The General President shall issue and sign all charters, may grant dispensations

in extraordinary cases and shall fill any vacancies among the General Officers by consent of a majority of the General Executive Board. * * *" Section 10 A Constitution.

"He may personally, or by deputy, take possession for examination, of all books, papers and financial accounts of any Local Union, District Council, State Council or Provincial Council, summarily when he may deem it necessary, and the same shall remain in his possession within the jurisdiction of the Local Union, District Council, State Council or Provincial Council until a complete report has been made and filed. During said examination a representative of the Local Union, District Council, State Council or Provincial Council may be present." Section 10 B Constitution.

"He shall decide all points of law, appeals and grievances, except death and disability claims, and have power to suspend any Local Union, District Council, State Council or Provincial Council for violation of the Constitution or International Laws of the United Brotherhood subject to an appeal to the General Executive Board. Any Local or Auxiliary Union, District Council, State Council or Provincial Council which wilfully or directly violates the Constitution, Laws or principles of this United Brotherhood, or acts in antagonism to its welfare, can be suspended by the General President in conjunction with the General Vice-Presidents." Section 10 F Constitution.

"He shall supervise the entire interests of the United Brotherhood, and perform such other duties as the Constitution and Laws of the United Brotherhood may require, * * *." Section 10 H Constitution.

"Whenever, in the judgment of the General President, subordinate bodies or the members thereof are working against the best interests of the United Brotherhood, or are not in harmony with the Constitution and Laws of the United Brotherhood, the General President shall have power to order said body to disband under penalty of suspension. * * *" Section 10 K Constitution.

Relating to Appeals and Grievances:

"A member who has a grievance or who has had an injustice done him in any way, or any Local Union, District, State or Provincial Council having any grievance, may appeal to the General President for redress, subject to a further appeal to the General Executive Board and a final appeal to the General Convention, except violations of Trade Rules; but in no case shall an appeal act as a stay of proceedings, except as provided in the Constitution and Laws of the United Brotherhood.

"In case a fine is imposed by the Local Union or District Council, and an appeal is taken, said fine shall be held by the body assessing same until said appeal is finally and completely decided.

"No appeal can be entertained by the General President where any sum of money in excess of Fifty Dollars ($50.00) is involved unless the appellant has first paid to the Local Union or District Council Fifty Dollars ($50.00) on account, to be held until the appeal is decided by the General President, and if said appeal is decided against the appellant, he shall pay the full amount imposed before taking a further appeal. In all cases where the fine is Fifty Dollars ($50.00) or less the member fined shall pay the full amount to the Local Union or District Council imposing same.

"Any member or subordinate body of the United Brotherhood desiring to take an appeal shall have such appeal made in duplicate. One copy shall be forwarded to the General President and the other copy served on the member or subordinate body against whom the complaint is made within thirty days after the date of the action or grievance complained of. If an appeal is taken from the decision rendered, a notification of said appeal must be sent to the General President within thirty days after the date of the decision made.

"When an appeal is taken from the action of a subordinate body there shall be sent to the General President as well as to the appellant in the case, within thirty days, a full and complete copy of the minutes and charges as presented at the trial, together with the answer to the appeal. However, in cases where the act complained of would be in force and effect before the time designated in which to file answer has elapsed the General President is empowered to cause suspension of penalty becoming effective against appellant until answer has been filed and decision rendered.

"Failing to comply with the above, the General President shall have power to decide the case of appeal on the papers be-

fore him. The appellee failing to comply with the above forfeits all further rights to appeal from action of the General President.

"All parties to an appeal to the General President are required to go before a Notary Public and make affidavit to the truth of their written or printed statements." Section 57, Parts A to G, inclusive, General Laws.

"The General Executive Board shall be composed of the General President, First General Vice-President, General Secretary, General Treasurer, and one member from each of the above divisions of the United Brotherhood, who between Board meetings shall devote their entire time to the interest of the United Brotherhood, under the supervision of the General President. The General President shall be chairman of the General Executive Board and the General Secretary the secretary; they shall hold quarterly meetings, or when required, and at the call of the chairman of the General Executive Board, special meetings. All correspondence and appeals for the General Executive Board shall be sent to the General Secretary, who shall present same at the next regular meeting of the Board. No General Officers shall vote on decisions rendered by themselves. The proceedings of the General Executive Board shall be published in 'The Carpenter.'" Section 15 C, Constitution.

"The General Executive Board shall decide points of law, all grievances and appeals submitted to them in legal form and their decisions shall be binding until reversed by the Convention." Section 15 D, Constitution.

Relating to funds of a Local Union and rights of members of a suspended local.

"The General Funds or property of a Local Union shall be used only for such purposes as are specified in the Constitution and Laws of the United Brotherhood and as may be required to transact and properly conduct its business, viz.: Payment of salaries and donations to sick members; purchasing stationery, books, cards, printing, payment of rent, or any legally authorized bill against the Local Union. But under no circumstances shall any of the General Funds be used for loans or donations to members, Contingent Fund or for political or religious purposes. Violation of this Section subjects the of-fending Local Union to the penalty of suspension." Section 58 A, General Laws.

"The funds or property of a Local Union cannot be divided in any manner among the members individually, but shall remain the property of the Local Union for its legitimate purpose while ten members remain therein." Section 58 C, General Laws.

"A member of a lapsed or suspended Local Union, if he is in good standing, can take a clearance to the nearest Local Union in his vicinity, upon application to the General Secretary, who shall issue same. Said clearance can be sent by mail to the nearest Local Union and can be accepted without requiring the personal attendance of the member." Section 30 C, General Laws.

The provisions of Section 30 A of the General Laws of the United Brotherhood, relating to disposition of the property of a suspended Local have been heretofore set out.

Based upon the foregoing findings of fact, this Court concludes as a matter of law that:

1. The constitution and laws of the United Brotherhood are reasonably susceptible of a construction empowering and authorizing the General President to promulgate his order of March 27, 1943. This order being within the powers and jurisdiction of the General President was therefore a mandate of the United Brotherhood and binding upon Local 14.

2. As Local 14 refused to obey this mandate, the General President, under a permissible construction of the constitution and laws of the United Brotherhood, was authorized to issue a suspension order. The order of suspension of April 20, 1943, must therefore be recognized as valid.

3. The application and enforcement of the provisions of Section 30 A of the General Laws of the United Brotherhood, under the facts of this case, do not deprive Local 14 of its property without due process of law.

4. The judgment of the trial court should be reversed and judgment entered as hereinafter directed.

 By way of explanation of the foregoing conclusions of law, we will state that generally the rights and duties of members and subordinate bodies of a voluntary unincorporated association are measured and determined by the constitution and laws of

the association. "A labor union has the right to make and adopt reasonable rules and by-laws governing the conduct of its members. So long as the by-laws of a union relate to matters in which no one except the association and its members is interested, and violate no right of a third person and no rule of public policy, they are valid. The articles of agreement of a labor union, whether called a constitution, charter, by-laws, or any other name, constitute a contract between the members which the courts will enforce, if not immoral or contrary to public policy or the law of the land." 31 Am.Jur. 856.

■■ The trial court held in effect that the General President never acquired jurisdiction to enter his order of March 27, 1943, lifting the penalty of suspension against certain members assessed by Local 14, because an appeal in proper form and within the prescribed time was not taken from the suspension order entered by the local union. This view admittedly represents a possible construction of the applicable rules and laws of the United Brotherhood. However, these rules and laws are not viewed in the same light by the civil courts as is a statute passed by a legislature. The power to interpret a statute is vested in the courts. The power to interpret a law or rule of a voluntary association is generally vested in some officer, committee or board of the association itself. We would not be justified in regarding as nugatory the action of an officer clothed with the power to "decide all points of law, appeals and grievances" unless such action was wholly unsupported by any reasonable view or construction of the laws of the association.

It is apparent that under the constitution and laws of the United Brotherhood, the General President is the executive head of the organization. He is clothed with judicial authority and empowered to grant dispensations in extraordinary cases. He has supervision over the entire interests of the United Brotherhood.

The charges contained in the letters which caused the General President to investigate and ultimately to act are these: That Local 14 had permitted its members to work for the Zachry Company, which maintained an open shop; that on the Laredo project some 266 union carpenters were employed, constituting ninety-five per cent of all the carpenters employed. The business agent of Local 14 had ordered these union carpenters to quit the Laredo job under threat of disciplinary action. To say that the International body, through its General President, has no power to investigate charges of this nature and take action in regard thereto is simply to say that the general organization upon its own initiative is not empowered to enforce the American Federation of Labor "no strike pledge" among its various subordinate bodies.

■■ In our opinion, no such construction of the constitution and laws of the United Brotherhood is compelled by the terms and provisions thereof. The order lifting the suspension of those charged with violation of the Trade Rules of Local 14 may be regarded as the granting of a dispensation which is generally understood in law to mean the relaxation or suspension of a law in a particular case. Webster's New International Dictionary.

There is considerable discussion in the briefs relative to the legality of the original suspension order of Local 14. It is asserted that under the trade rules involved and the laws of the general organization, Local 14 was only authorized to either fine *or* expel, but could not fine *and* suspend. On the other hand, it is insisted that the suspended members did not properly appeal, and the General President never acquired jurisdiction of the case as the suspended members never paid the fines assessed and did not perfect their appeal, so to speak, within the time prescribed by the laws of the United Brotherhood. Finally, it is insisted by the United Brotherhood that compliance with the order of the General President, dated March 27, 1943, by Local 14, is a necessary prerequisite to an appeal from that order to the General Executive Board. These questions are matters for the decision of the judicial and appellate authorities established and selected by the members of the association. The action of the General Executive Board in refusing to consider the attempted appeals of Local 14, because of its refusal to abide by the order of the General President, could at most operate only to excuse Local 14 from applying to the higher appellate bodies of the organization for relief before applying to the civil courts for redress. This action by the General Executive Board does not show nor tend to show that the action of

the General President was unauthorized or void.

The General President did assume jurisdiction of the case. He did, as the superior appellate authority of the association, enter a peremptory order with reference thereto.

The nearest case upon the facts which we have been able to find is that of Simpson v. Grand International Brotherhood of Locomotive Engineers, 83 W.Va. 355, 98 S.E. 580, 587. The chief executive officer of the Brotherhood of Locomotive Engineers was the "Grand Chief Engineer," whose powers and authority were very similar to those of the General President of the United Brotherhood. We quote from the opinion in the Simpson case:

"Section 8 of the constitution requires the Grand Chief Engineer to devote his entire time to the interest of the Brotherhood, declares him to be the official head of the order and expressly vests in him power to exercise full control over the grand office and the order in general. It also clothes him with authority to entertain appeals, and makes his decisions final and conclusive until the triennial meeting of the Grand International Division. Section 66 of the statutes provides that any division willfully violating any rule or regulation of the Grand International Brotherhood may have its charter suspended by the Grand Chief Engineer, until the next meeting of the Grand International Division. The terms of these provisions are broad enough to include both executive or administrative powers and quasi judicial authority. Since the order is composed of its subordinate bodies, as well as its members, authority vested in the Grand Chief Engineer to exercise full control over the order in general may reasonably be construed as carrying a power of visitation and direction over the divisions, and as effectually excluding the theory of lack of authority in this official to act otherwise than upon an appeal formally taken to him."

It appears that Simpson and Smith, members of the Brotherhood of Locomotive Engineers, had been acquitted of charges of violating union regulations, by the local or "division" to which they belonged. Information concerning this trial was forwarded to the Grand Chief Engineer, who brought about a retrial of the charges through a threat of suspension of the local. Upon retrial Simpson and Smith were both convicted. The authority of the Grand Chief Engineer was questioned and with reference thereto the court said:

"* * * The appellate jurisdiction of the Grand Chief Engineer is not questioned here. It is expressly conferred by section 8 of the constitution. *One of the contentions seems to be that he had no authority or power to intervene or interpose in the cases pending in division No. 448, because neither the division, on the one hand, nor the accused members, on the other hand, had prosecuted an appeal, so as to bring the controversy within his jurisdiction as conferred by that section of the constitution, and because he seems to have acted in the matter at the instance of Huff.* Manifestly, the question thus raised was one for decision, in the first instance by the Grand Chief Engineer, and ultimately and finally in the Grand International Division, to which an appeal might have been taken. If the interpretation of the constitution were, for all purposes, within the jurisdiction of this court, and the position taken by the attorneys for the plaintiffs accepted as sound, it might be adopted as the basis of the decision. But the construction of the organic agreement, by-laws, rules and regulations of a benefit society or other unincorporated voluntary association belongs, not to the court, but to the board, council, or other tribunal provided for the purpose in the organization, if any. So long as the body upon which this power of interpretation has been conferred does not substitute legislation for interpretation, nor transgress the bounds of reason, common sense, or fairness, nor contravene public policy or the laws of the land, in their conclusions and decisions, the courts cannot interfere with them." (Citing authorities) (Italics ours.)

Having held that the order of March 27, 1943, was valid, there can be little doubt of the validity of the General President's order suspending Local 14. The refusal of a subordinate body to comply with a mandate of the general organization is a ground for suspension under the laws of the association. This remedy for the suppression of insubordination may be harsh and drastic but it is provided for by the laws of the association to which all members thereof agreed to be bound. District Grand Lodge No. 25, Grand United Order of Odd Fellows v. Jones, 138 Tex. 537, 160 S.W.2d 915. And, as stated in Simpson v. Brotherhood, supra: "It must be remembered that the association was not formed

in absolute accord with the scheme or plan of the state government."

We are further of the opinion that neither the "due process" clauses of the national or state constitutions prevent the enforcement of the provisions of Section 30 A of the laws of the United Brotherhood under the facts of this case. The order of suspension against Local 14 was not entered until the local had been fully informed that a refusal to abide by the General President's order of March 27, 1943, would result in a suspension, and a vote upon whether or not the local would abide by the order had been deliberately taken at a meeting called for that purpose. As heretofore pointed out, no individual here complains that he is deprived of any right or property without due process of law.

The judgment of the trial court is reversed and this cause remanded to the trial court with instruction to enter a decree in favor of appellant in accordance with the holdings herein set forth.

### On Motion for Rehearing.

Appellee's motion for rehearing contains an assignment asserting that this Court erred in holding that the manner and method adopted by the General President in suspending the charter of Local 14 did not violate the requirements of "due process law."

Our original view of the question of·the validity of the suspension order here involved was that the requisites of due process of law had been complied with, inasmuch as Local 14 had refused to abide by and recognize an order legally promulgated by the General President, and at a meeting of Local 14, the members present were informed that persistence in the adopted course of action would result in a suspension.

■ The general American rule is that when the constitution or laws of an unincorporated association provide for the suspension or revocation of the charter of a subordinate body (or the suspension or expulsion of a member), but do not provide for charges, notice and hearing relative to such action, the courts will recognize as valid only such actions taken under the association's laws as are taken in pursuance of charges made, notice given and hearing had. Taboada v. Sociedad Espanola De Beneficencia Mutua, 191 Cal. 187, 215 P. 673, 27 A.L.R. 1508; 10 C.J.S., Beneficial

Associations, § 52, p. 295; 63 C.J. 698. This rule may be stated by saying that the law writes into the constitutional or by-law provisions of the association relating to the suspension or revocation of a charter, the requirement that such suspension or revocation must be effected by "due process of law," that is, upon charges, notice and hearing.

■ There is some diversity of opinion, however, as to what particular kind of notice and hearing is required. The New York Supreme Court holds that a hearing must be had prior to the suspension. "The trial referred to in the adjudicated cases, however, is a due trial upon charges before judgment, without the added burden of the presumption of correctness of a decision." Neal v. Hutcheson, Sup., 160 N.Y.S. 1007, 1010. See also Kennedy v. Schrocder, Sup., 35 N.Y.S.2d 835. The Supreme Court of Minnesota takes a somewhat contrary view in Mixed Local, etc., v. Hotel and R. Employees, etc., 212 Minn. 587, 4 N.W.2d 771, and holds that the requirements of due process of law are complied with, provided adequate provision is made for an appeal and trial de novo before a superior appellate body of the association after an order of suspension has been entered by an inferior authority of the organization. This conflict of views is not involved here, because, even if the reasoning and holding of the Minnesota Court be followed, it appears in the instant case that Local 14 did not obtain a hearing before the Executive Board of the United Brotherhood relating to the order of suspension, inasmuch as that body refused to accept and consider the Local's attempted appeal.

■ The specific question presented here is whether or not a notice given by the general organization to a local subordinate association that if a certain action is taken by the local association a suspension will follow, satisfies the requirements of due process of law as to charges, notice and hearing, or is it necessary to the validity of a suspension order that the general organization, upon the refusal of the local to abide by its order, go further and thereafter prefer charges against the local, give notice thereof and conduct a hearing to determine whether or not the local should be suspended.

Appellee cites Ellis v. American Federation of Labor, 48 Cal.App.2d 440, 120 P.2d 79, decided by one of the District Courts of

570

Appeal of California. In this case it appears that Meyer Lewis, as personal representative of William Green, president of the American Federation of Labor, had informed the Central Labor Council of Santa Clara County, California (a subordinate unincorporated body of the A. F. L.), not to seat a certain disputed delegation until a certain investigation could be completed. Lewis further notified the Central Labor Council that if said delegates were seated by the Council, he, Lewis (presumedly acting for and in behalf of William Green, president of the A. F. L.), would "jerk the charter" of the Central Labor Council. The Central Labor Council did seat the delegates and as a result its charter was removed by the president of the American Federation of Labor. The California Court held that the attempted removal or revocation of the charter was void. This holding was not based upon a decision of whether or not the Central Labor Council had "committed any breach of its obligations to the American Federation of Labor, or was guilty of any conduct which would justify the suspension or revocation of its charter," but upon the ground that such action was void as having been accomplished without charges having been filed, notice thereof given, and a hearing had upon the charges preferred. The power of suspension was regarded as a quasi-judicial power. Taboada v. Sociedad Espanola de Beneficencia Mutua, supra.

We have concluded that the California case should be followed. Consistency in decision of the American authorities upon the point is desirable.

Our conclusions of law Nos. 2, 3 and 4, of the original opinion, are set aside. We conclude as a matter of law that the suspension order of April 20, 1943, was and is invalid.

Based upon the findings of fact and conclusions of law of this Court, set forth in this opinion as well as in the original opinion, an affirmance of the trial court's judgment will be ordered, without prejudice to either party's taking such further actions in regard to the matters in controversy, as they may deem advisable within the organization and under the constitution and laws thereof.

We sustain the first assignment contained in appellee's motion for rehearing. Our former order reversing and remanding this cause is set aside. The judgment of the trial court is affirmed.